IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

---oOo---

BEFORE THE HONORABLE JOHN A. MENDEZ, JUDGE

---oOo---


SHEILA GOODEN, an
individual, and MICHELLE
HALL, an individual,

     Plaintiffs.          No. CV.  S-11-2595

vs.


SUNTRUST MORTGAGE, INC., a
Virginia Corporation,

     Defendant.

_____/


---oOo---

REPORTER'S TRANSCRIPT

MOTION HEARING

FRIDAY, NOVEMBER 15, 2013

---oOo---




Reported by:     KIMBERLY M. BENNETT, CSR #8953

RPR, CRR, RMR

APPEARANCES


For the Plaintiffs:

      Cotchett Pitre and McCarthy LLP
      840 Malcolm Road
      Suite 200
      Burlingame, California  94010
      BY:  Justin T. Berger
           Attorney at Law
           Eric J. Buescher
           Attorney at Law

For the Defendant:

      Severson & Werson
      One Embarcadero Center
      26th Floor
      San Francisco, California  94111
      BY:  Philip Barilovits
           Attorney at Law
           Michael J. Steiner
           Attorney at Law

1          SACRAMENTO, CALIFORNIA

2          NOVEMBER 15, 2013, 1:33 P.M.

3              --o0o--

4          THE CLERK:  Civil S-11-2595; Gooden, et al. versus

5    SunTrust Mortgage, Incorporated.

6          Counsel, state their appearances, please.

7          MR. BERGER:  Good afternoon, Your Honor.  Justin

8    Berger of Cotchett, Pitre and McCarthy, on behalf of the

9    plaintiffs and the putative class.

10         MR. BUESCHER:  Eric Buescher of Cotchett, Pitre and

11   McCarthy, as well.

12         MR. BARILOVITS:  Good afternoon, Your Honor.  Phil

13   Barilovits of Severson & Werson for defendant SunTrust

14   Mortgage, Inc.

15         MR. STEINER:  Good afternoon, Your Honor.  Michael

16   Steiner of Severson & Werson, also on behalf of SunTrust.

17         THE COURT:  We're here on a motion for class

18   certification in this case.  The Court has reviewed all the

19   briefs, and I'm prepared to move forward this afternoon.

20   I'll have a number of questions throughout, and then I am

21   prepared to rule on this motion this afternoon.

22         The motion is interesting in many respects.  First,

23   the plaintiffs, proceeding under their first amended

24   complaint, seek class certification on certain claims, and

25   for a number of different classes.  So, it's unique in the

1   sense that the plaintiffs are really seeking certification of

2   six different classes as follows:

3          Under their first claim for relief, which is a

4   violation of the Truth in Lending Act, TILA, they're seeking

5   a nationwide class that were allegedly force placed hazard

6   insurance; what we've referred to as a nationwide hazard

7   class.

8          Under their second class, they're seeking

9   certification for -- they're seeking certification for a

10   nationwide class who were force placed flood insurance under

11   their TILA claims; so, a nationwide flood class.

12          There are then breach of contract claims, and under

13   those claims they're seeking for hazard insurance -- force

14   placed hazard insurance classes within California and classes

15   within New York.

16          There is also a class being sought under their

17   California Civil Code Section 2955.5 claim; again, a

18   California hazard class.

19          Under their fifth claim for relief, which is a

20   violation of Business and Professions Code Section 17200,

21   also referred to as the UCL, they're seeking a hazard class

22   in California.

23          And then, finally, they're also seeking a class under

24   the same statute for those that were force placed flood

25   insurance, again, only in California.

1              I hit them all, right?

2              MR. BERGER:  Yes, Your Honor.

3              THE COURT:  Okay.  I want to start with the -- also,

4     just as an aside for purposes of the record, there was a

5     request for judicial notice.  It wasn't opposed.  It was two

6     documents; one was a brief filed by the United States in an

7     Eleventh Circuit case, and then the second was a Consumer

8     Compliance Handbook, 2006-2012, issued by the Board of

9     Governors of the Federal Reserve System.  Again, not central,

10    really, to this motion, but there was no opposition and the

11    Court did look at those documents as well.

12             Before I actually want to get to the merits of the

13    plaintiffs' motion, the first question I have, Mr. Berger,

14    is, in your motion -- and, again, I realize the original

15    motion was filed before my ruling on the motion to dismiss,

16    but you write that "for flood insurance, the limit is the

17    lesser of the replacement cost of the property or $250,000."

18    And then in parentheses you put, "the maximum insurance

19    available under the National Flood Insurance Program."  This

20    is page 4 of your motion.

21             Then, additionally, regarding flood insurance,

22    plaintiffs have claimed that defendant, quote, may only

23    require coverage if the underlying property is actually

24    located within a flood zone, closed quote, and that "Closing

25    Instructions limit the flood insurance to the federal

 1     requirements."  That's on page 6 of your brief.

 2          I didn't see anything in the National Flood Insurance

 3     Act that sets a maximum that a lender may require, or that

 4     prohibits a lender from requiring flood insurance for

 5     property outside of flood zones.  And in that DOJ brief that

 6     was submitted as part of the motion for judicial notice, and

 7     the defendants in their opposition, argue the same point.

 8          So, I'm unclear as to the basis for that statement.

 9          You can remain seated as long as you've got the mike

10     in front of you.

11          MR. BERGER:  Your Honor, we believe that the closing

12     instructions create that limit.  And while a lender may have

13     the option to require flood insurance for folks outside of

14     the floodplain, SunTrust didn't do that here.  They didn't

15     make that clear in the closing instructions, or anywhere else

16     in the closing documents.

17          THE COURT:  Again, you filed your motion before my

18     motion to dismiss, but my motion to dismiss order, more or

19     less, foreclosed that theory.

20          Given that, is there any other basis for the claim?

21          MR. BERGER:  Well, we think Your Honor's order did

22     leave open the possibility then, under 17200, for example, or

23     under a breach of covenant of good faith and fair dealing,

24     such a claim could survive and could go to a jury.

25          THE COURT:  But not under TILA.

 1          MR. BERGER:  Under TILA, Your Honor, we think the key

 2   issue is whether the disclosure is fully accurate.  If you

 3   look at Judge Alsup's ruling in the case SunTrust cites --

 4          THE COURT:  The Lane case?

 5          MR. BERGER:  Yeah, the Lane case.  He talks about --

 6   that the -- where the disclosures initially provided by the

 7   lender were insufficiently specific with regard to when and

 8   under what circumstances mandatory flood insurance

 9   requirements might be imposed at some later date, there could

10   be a TILA violation.  He's describing his prior Hofstetter

11   case in that paragraph.  That's at page 41 of the Lexis

12   version of that case cited by SunTrust.

13          So, we think the disclosures here don't meet that

14   standard under TILA.

15          THE COURT:  Anything you want to respond to, just on

16   that specific issue?

17          MR. BARILOVITS:  Yes, Your Honor.

18          THE COURT:  Okay.

19          MR. BARILOVITS:  The issue of -- first of all, the

20   issue of whether or not TILA under the UCL claim, based on

21   this theory of closing instructions, is foreclosed by your

22   order on the motion to dismiss, SunTrust's view is it is, in

23   fact.

24          TILA -- the TILA -- first of all, let me say this:

25   This theory about the disclosures being insufficient really

1    isn't the basis for their motion.  The basis for their motion

2    was that we required excess flood insurance.  The issue of a

3    misleading disclosure, or an insufficient disclosure, is

4    nowhere in their motion.

5          Even if it were, the TILA claims in closed-in credit,

6    like mortgages, after origination, the cases all hinge upon

7    whether or not the mortgage agreement was breached.  So it's,

8    in some sense, a derivative claim of the state law mortgage

9    claim.  Judge Alsup in the Lane case and Judge Spero in the

10   McKenzie case said as much.

11         And so -- and as far as the UCL claim, this also is

12   derivative.  If the federal government has made no claim, or

13   no -- no regulation that requires lenders to cancel flood

14   insurance outside of a flood zone, it doesn't state a UCL

15   claim.  This is partially because the mortgage agreement

16   specifically allows the lenders to require flood and hazard

17   insurance in the amount and for the periods it requires.  It

18   doesn't say anything about flood zone and not flood zone,

19   it's simply up to the lender's discretion, exercised

20   reasonable.

21         And here there is no -- the Feaz case points out it is

22   perfectly reasonable in some circumstances to require flood

23   insurance outside of a flood zone.

24         On the UCL point, too, I want to make clear on this,

25   there is a -- one of the agency -- interagency guidances in

1   the federal register we quote in the brief, the federal

2   government says, specifically, lenders may require flood

3   insurance outside of a flood zone.  This is coming very, very

4   close to being specifically allowed by law.  And under

5   California law, under the UCL, if something is specifically

6   allowed under law, it cannot be the basis for a UCL claim.

7        And I'll cite the case of Cel-Tech Communications, and

8   that's 20 Cal 4th 163 at 1 --

9        THE COURT:  Did you cite it in your brief?

10       MR. BARILOVITS:  No.

11       THE COURT:  Then don't cite it to me in oral argument.

12       The defendants also submitted a supplemental

13   authority, notice of supplemental authority, it's a case from

14   the Central District of California decided on November 4th,

15   the Gustafson versus Bank of America Home Loan Servicing.

16       I wasn't clear why you submitted that, given the

17   nature of the class certification request.  It was a

18   nationwide UCL class.  I don't have a nationwide UCL class.

19   There was another nationwide class, I think for breach of

20   contract.  I don't have that in this case.  So, I wasn't sure

21   why you were -- I didn't find the facts to be applicable at

22   all to the classes that I'm being asked to certify in this

23   case.

24       MR. BARILOVITS:  You're right, Your Honor.  Perfectly

25   reasonable to believe that the Gustafson case involved a

 1 | different kind of case, different kind of lender placed

 2 | insurance case.

 3 |       The reason we submitted that is partially because in

 4 | that case it was a matter of commissions, and wasn't a

 5 | coverage case like this one, but it did point out that breach

 6 | of contract and other state laws vary from state to state.

 7 | And it's our view in this case that the TILA claim, being

 8 | derivative of the mortgage -- of the contract claim, and/or

 9 | statutory claims in other states, is, in fact, dependent upon

10 | state law variations.  So, that's the only -- that's -- we

11 | recognize it's a different kind of case.

12 |     THE COURT:  Okay.  The guts of the opposition focused

13 | on this replacement cost or replacement value, and the

14 | defendant's use of a proxy, and the plaintiffs', in effect,

15 | request that the proxy should be used and can be used in this

16 | case.

17 |       Is there a court that's had this issue, this specific

18 | issue, before it, the availability of the use of a proxy in a

19 | class action?  Or is this -- I got the impression from the

20 | briefs that this really is -- this specific issue is more or

21 | less an issue of first impression.  Or was there some case

22 | that I just missed that either side submitted that dealt with

23 | this?  It's a pretty specific issue.  It's a pretty specific

24 | defense to the class cert.  I mean, put it most simply,

25 | replacement value is an individual determination, and just

1    because we use a proxy doesn't mean that the plaintiffs

2    should be allowed to use a proxy.

3           So, again, I know the defense, you cited to a number

4    of -- and argued a number of reasons why it shouldn't be

5    allowed to be used, but has that -- did either of you find

6    any case that more or less addressed that specific issue?

7           MR. BERGER:  We did not, Your Honor, one way or the

8    other.

9           MR. BARILOVITS:  No.  The closest we came was the --

10   you know, the general principle of Wal-Mart, and changing

11   substantive law, but no.

12          THE COURT:  All right.

13          Let me focus first on the two -- the request for two

14   nationwide classes.  I don't need and I don't want a lot of

15   argument.  Let me tell you where I stand on that request for

16   certification:  I don't believe that certification is

17   appropriate for a number of reasons.

18          The two nationwide classes, again, that are being

19   sought are all persons who have or had loans with defendant,

20   secured by residential property in the United States, who

21   were force placed for hazard insurance in excess of the

22   lesser of the replacement cost of the property or the greater

23   of the unpaid principal balance at the time of force

24   placement and 80 percent of their replacement cost of the

25   property on or after September 30, 2010.  And for the

1    nationwide flood insurance class, all persons who have or had

2    loans with defendant, secured by residential property in the

3    United States, who were force placed for flood insurance in

4    excess of the amount required under the Flood Disaster

5    Protection Act, on or after June 19, 2012.

6           We're not going to have any discussion about

7    numerosity.  That really wasn't argued.  It's not an issue.

8    And the Court does find that the proposed classes would meet

9    the numerosity requirement.

10          Under the commonality issue, analyzed under

11   Rule 23(a)(2), a plaintiff would satisfy this element in the

12   past by showing, at a minimum, the "existence of shared legal

13   issues with divergent factual predicates" or "a common core

14   of salient facts coupled with disparate legal remedies within

15   the class."  In the Dukes case, the Supreme Court clarified

16   what 23(a)(2) requires, and said, "What matters to class

17   certification is not the raising of common 'questions' --

18   even in droves -- but, rather the capacity of a class-wide

19   proceeding to generate common answers apt to drive the

20   resolution of the litigation."  Even a single common question

21   that meets these criteria satisfies Rule 23(a)(2).

22          In addition to the threshold requirement of 23(a)(2),

23   a plaintiff seeking certification -- and I'm going to focus

24   just on 23(b)(3), we'll come back to 23(b)(2) at the end -- a

25   plaintiff seeking certification under 23(b)(3) must satisfy

1    two additional commonality conditions:  "common questions

2    must 'predominate over any questions affecting only

3    individual members' and class resolution must be 'superior to

4    other available methods for the fair and efficient

5    adjudication of the controversy.'"

6           Under Rule 23(b)(3), plaintiffs seeking to represent a

7    class must show that a class action is superior to other

8    methods of adjudication considering difficulties likely to be

9    encountered in the management of a class action.  The

10   "manageability requirement includes consideration of the

11   potential difficulties in notifying class members of the

12   suit, calculation of individual damages, and distribution of

13   damages."

14          Since Rule 23(b)(3) is basically a heightened

15   commonality inquiry, the two analyses can be made together.

16          Plaintiffs have argued that the two nationwide classes

17   consist of defendant's customers who assert claims that raise

18   substantially similar issues of law and fact.  The two claims

19   require a determination of whether the defendant did violate

20   TILA by failing to make timely disclosure of all finance

21   charges, other charges, and third-party charges imposed in

22   connection with a mortgage loan or line of credit.

23          Plaintiffs have contended that the defendant utilized

24   the same or substantially similar disclosure materials and

25   procedures for its customers irrespective of the location.

1          Again, the motion was filed before the Court's most

2     recent ruling on the motion to dismiss.  Initially, the

3     motion for class certification opening brief relied on the

4     closing instructions to set the amount required of the

5     borrowers.  This Court found in that order that the closing

6     instructions do not place a maximum on the amount of hazard

7     insurance that could be required, but rather the

8     discretionary clauses in the mortgage agreements put it in

9     the sound discretion of the defendant.

10          And this Court further found that relevant state laws

11     and the implied covenants included in such agreements placed

12     limits on that discretion.

13          That also was discussed in the Lane versus Wells Fargo

14     case, the 2013 case that we'll talk about here today.

15          Although the motion to dismiss dealt with solely

16     hazard insurance, the discretionary clause in, for example,

17     Ms. Gooden's deed of trust, relied on in making that ruling,

18     extends to various forms of insurance, including both hazard

19     and flood insurance.  Similar discretionary language is found

20     in Ms. Hall's mortgage.

21          Both Ms. Hall's and Ms. Gooden's agreements contain

22     provisions that provide the laws of the jurisdiction in which

23     the property was located would apply.  And defendant in its

24     opposition has argued that TILA does not set any kind of

25     maximum amount of flood or hazard insurance that lenders can

1    require.

2         Defendants, therefore, contend that the respective

3    state laws governing implied contractual covenants, the

4    calculation of replacement value, and limitations on the

5    amount of hazard and flood insurance that can be required

6    would control loans in those states.  Furthermore, while TILA

7    is a federal statute, the underlying basis for these claims

8    arise based on circumstances of the individual transactions

9    and the unique effect of the individual states' rules

10   pertaining to them.

11        The Ninth Circuit has held that "the law on

12   predominance requires the district court to consider

13   variations in state law when a class action involves multiple

14   jurisdictions."  And "In a multi-state action, variations in

15   state law may swamp any common issues and defeat

16   predominance."  And therefore, in determining whether a

17   plaintiff has met its burden, the district court must

18   consider how variations in state law affect predominance and

19   superiority and whether plaintiff has presented "a suitable

20   and realistic plan" for addressing them.

21        This was discussed in a number of cases cited in the

22   briefs, including Lozano versus AT&T Wireless Services,

23   Castano versus American Tobacco Company, Zinser v. Accufix

24   Research Institute, and then also the Lane versus Wells Fargo

25   case.

1          In the motion for class certification, plaintiff did

2     argue in the opening brief that variations in state law are

3     "nonexistent among the classes in this case."  There wasn't

4     much following that statement, but simply the conclusory

5     statement.

6          Defendants then, in their opposition, particularly

7     pages 16, 17, and 18 of the opposition, pointed out and gave

8     specific examples of how state laws would vary regarding

9     maximums on insurance, appropriate calculations for

10    replacement value, and the operation of the implied covenant

11    of good faith and fair dealing.  Reference is made to, for

12    example, Texas, Washington, North Carolina, Michigan,

13    Delaware, Maine, Massachusetts, South Carolina, Ohio,

14    Missouri, Oklahoma and Connecticut.

15         It's obvious -- well, also, for purposes of the

16    record, in the reply, the plaintiffs' only response to this

17    argument was a single sentence, buried in a footnote -- page

18    7, footnote 1 -- which simply contended that defendant's

19    argument would preclude any national TILA classes.  And then

20    they proceeded to cite a case in which an unrelated TILA

21    class was certified.

22         The Court finds that the defendant's arguments are

23    meritorious.  It is unclear to this Court how variations in

24    state law would be dealt with, how I could find that

25    plaintiff -- that the state laws do present common issues

1   among the class -- potential class members.  Therefore, I

2   find, with respect to at least the nationwide classes, that

3   plaintiff has not met their burden on establishing

4   commonality and predominance that's required under 23(a)(1)

5   and (b)(3) for the nationwide classes for flood and hazard

6   insurance.  So, the Court is denying the motion with respect

7   to the request that the TILA classes be certified.

8          There are other arguments that have been raised by the

9   defendant, but that's the one that just stood out with

10  respect to the nationwide classes; they clearly don't meet,

11  at least the Court finds, the requirements for class

12  certification.

13         Just on that specific issue, anything further that

14  plaintiffs want to raise for purposes of the record?

15         MR. BERGER:  No, Your Honor.

16         THE COURT:  Okay.  I assume the defense has nothing to

17  say.

18         MR. BARILOVITS:  No.

19         THE COURT:  Okay.  So, let's focus on the other

20  classes.

21         Let me focus first on the -- what we've called the New

22  York hazard class; that would be, in effect, Ms. Hall.  And

23  my question for the plaintiffs was simply whether you're

24  really still seeking certification of that New York class in

25  light of Ms. Hall's deposition testimony that there was no

1    hazard policy that was force placed on her.

2          So, your first obvious problem to me is you don't have

3    a representative plaintiff for that class.  There are other

4    problems that I can raise with you, but I wasn't sure why you

5    want to bring a New York hazard class into a court in the

6    Eastern District of California.

7          MR. BERGER:  Your Honor, Mr. Buescher is going to

8    address issues that are particular to one of the -- each of

9    the named plaintiffs.  So, I'll defer to him on that issue.

10         THE COURT:  Mr. Buescher, you know my question.

11   What's the answer?

12         MR. BUESCHER:  Your Honor, with respect to Ms. Hall

13   specifically, she was charged for what is referred to on her

14   statements as an additional hazard policy in her escrow.

15         THE COURT:  That's your only evidence?  Do you have

16   anything more?  If that's what you're relying on, I read

17   that, I saw that, is there anything more that you have?

18         MR. BUESCHER:  There is no indication that she was

19   force placed for a hazard policy outside of the charge for

20   additional hazard insurance.

21         THE COURT:  Okay.  You still think I have a basis for

22   certifying that class?

23         MR. BUESCHER:  We think that the question of whether

24   SunTrust's conduct in charging borrowers for what it calls

25   hazard insurance when it is not force placing hazard

1    insurance, or may not have force placed hazard insurance, on

2    each of those borrowers is a common merits question for that

3    entire class.

4         In the respect that if SunTrust has charged borrowers

5    for hazard insurance when that would have been an

6    unauthorized force placement for insurance, then that raises

7    a question of whether SunTrust has breached the contracts

8    that it has with those borrowers, or the covenant of good

9    faith and fair dealing with respect to those borrowers.

10        THE COURT:  If I don't accept that only piece of

11   evidence as a basis for allowing Ms. Hall to be the class

12   rep, you don't have a basis for class -- for the Court

13   certifying this as a class at this point, right, because you

14   don't have any class representative?

15        MR. BUESCHER:  In the state of New York, that would be

16   correct.

17        THE COURT:  Okay.

18        MR. BERGER:  Your Honor, I think an important point

19   here is that the SunTrust conduct in calculations with

20   respect to hazard and flood insurance were uniform.  Whether

21   they called it hazard insurance on a statement or flood

22   insurance, they're force placing insurance, they're doing it

23   in the same way, and they're doing it illegally.  And there

24   is really -- they're -- calling flood insurance hazard

25   insurance caused a great deal of confusion for consumers,

1   whether or not SunTrust actually eventually force placed a

2   hazard insurance or whether it was a flood insurance policy.

3   And there is the --

4          THE COURT:  We're not there.  I'm only focusing on

5   Ms. Hall and the New York -- we're taking these one at a

6   time.

7          MR. BARILOVITS:  Your Honor, may I add a few

8   comments --

9          THE COURT:  Go ahead.

10         MR. BARILOVITS:  -- about the additional hazard

11  insurance --

12         THE COURT:  Only if it deals with Ms. Hall.

13         MR. BARILOVITS:  This is Ms. Hall.

14         THE COURT:  Okay.

15         MR. BARILOVITS:  She was asked at her deposition, Were

16  you ever force placed for hazard insurance?

17         THE COURT:  Right.

18         MR. BARILOVITS:  And she said, unequivocally, no.

19         The additional hazard insurance has a whole slew of

20  problems with it.  One is, it's for an escrow, it's not for a

21  force placement, unless you have a very strange definition of

22  force placement.  There is no policy that was issued on

23  hazard insurance for Ms. Hall.

24         In addition, it was to the penny as to the amount of

25  flood insurance.  It was additional hazard, but it was for

1   flood.  And I think there is some testimony in her deposition

2   that she even realized this.

3        In addition, if we're sitting here wondering whether

4   or not Ms. Hall was ever force placed for hazard, and the

5   evidence is almost overwhelmingly, may even be perhaps a

6   motion for summary judgment, that she wasn't, how is she

7   going to be an adequate class representative at trial when

8   we're spending all of our time debating what additional

9   hazard insurance meant, and at the end of the day we're going

10  to find out there was no hazard insurance placed for

11  Ms. Hall.  She is an inadequate class representative.

12       THE COURT:  Okay.  I agree.  You can tell from my

13  questions, with respect to that class, I don't believe that

14  certification is appropriate for the following reasons:

15       The defendant has argued that no hazard policy was

16  ever force placed on Ms. Hall's property.  In the motion for

17  class certification, the plaintiffs merely mention a bill

18  that was sent to Ms. Hall charging her for, quote, additional

19  hazard insurance.

20       In addition, the defendant has pointed out that

21  Ms. Hall testified that her claim regarding force placed

22  hazard insurance policy, as stated in paragraph 27 of the

23  first-amended complaint was, in fact, mistaken.  That's in

24  Ms. Hall's deposition testimony at page 11, line 6, through

25  page 12, line 1.  She further testified in her deposition

1    that the only policy that was force placed on her home was,

2    in fact, flood insurance.  That's at page 134 of her

3    deposition.  And in the reply, the plaintiffs actually failed

4    to address the issue and simply focused on Ms. Gooden's

5    hazard claim and their flood claims.

6          For those reasons, the Court finds that because the

7    hazard policy was, in fact, never force placed onto

8    Ms. Hall's property or to Ms. Hall, she cannot be a named

9    plaintiff in this class action regarding any claims of force

10   placed hazard insurance for New York -- purported New York

11   plaintiffs.  So, the New York breach of contract subclass is

12   not and will not be certified for those reasons.

13         As to Ms. Gooden, and the issue of whether she is a

14   typical and appropriate plaintiff to represent the California

15   hazard insurance class, the issue is a little different.

16         The defendants -- first, the plaintiffs, with respect

17   to this claim, point out that there was a billing statement

18   sent to her by the defendant in April/May of 2011.  They're

19   relying on that claim -- or that statement to claim that

20   hazard insurance was, in fact, improperly force placed on her

21   property.  On that statement there are three line items that

22   are labeled, quote, hazard insurance, quote, flood insurance,

23   and then, quote, additional hazard insurance.  And plaintiff

24   has argued that the additional hazard insurance line item

25   references the force placed hazard policy.

1          Defendants have argued that the line item is, in fact,

2     a catchall category, is actually -- actually indicates a

3     charge for additional flood insurance, and argues that there

4     is no basis to believe that hazard insurance was ever force

5     placed on Gooden.  And if the Court, obviously, agrees with

6     that, then Ms. Gooden would not be an appropriate class

7     representative for that subclass.

8          In the reply, the plaintiffs have pointed out the

9     deposition testimony of an insurance manager by the name of

10    Terry Curbeira, C-U-R-B-E-I-R-A.  In her deposition,

11    Ms. Curbeira was asked about line items on the billing

12    statement, and testified that the, quote, additional hazard

13    insurance, quote, indicated a force placed hazard insurance

14    policy; however, she then submitted a later declaration

15    stating that she misread the statement and misspoke in her

16    deposition.  There is also correspondence that was presented,

17    at least I recall seeing, in which there is a request to

18    clear up what was deemed an ambiguity.

19         In the declaration, Ms. Curbeira stated that the line

20    item in question actually references a force placed or gap

21    flood insurance policy.  She contended that this change in

22    statement should be re -- plaintiffs have contended that the

23    change in the statement should be rejected because

24    Ms. Curbeira should have gone through the errata process in

25    the deposition rather than wait seven months and then submit

1    a declaration.  And the plaintiffs have argued that her claim

2    of mistake is not credible.  And then they also have argued

3    that I should apply summary judgment standard and not allow a

4    deposition that -- a declaration that contradicts a

5    deposition.

6         I read the deposition.  I read the questions asked.

7    And then I read Ms. Curbeira's declaration.  I don't find

8    that there is a lack of credibility.  So, the argument as to

9    credibility I don't think has much merit.  And I found her

10   declaration, frankly, to be straightforward and honest.  It

11   wasn't the greatest set of questions at the deposition.  They

12   were somewhat ambiguous and could have required, and should

13   have required, more clarification.

14        If that, again, is the only basis for the claim, at

15   least Gooden's claim, that hazard insurance was force placed

16   on her, I don't think it's enough.  It's an incredibly weak

17   claim if that's the only evidence.  And absent more evidence

18   that Gooden was, in fact, ever subjected to improper force

19   placed hazard insurance -- and as I recall, wasn't this

20   the -- in the deposition there was documentation that showed

21   that, ultimately, in the statement the following month, there

22   was an adjustment where she had a credit of one cent, and as

23   I recall, Ms. Gooden couldn't produce any type of billing

24   statement, or at least payment, of a force placed hazard,

25   couldn't recall any policy being sent to her.  I mean, there

1    was a whole lack of evidence that would support at least your

2    view of this that simply because there was this statement on

3    this -- and, again, it was an escrow account, as I recall.

4           I don't -- I'll find specifically, I know the

5    plaintiffs will disagree, that's just not sufficient for me

6    to feel comfortable in allowing Ms. Gooden to represent this

7    purported class.  And, in fact, if she was never, in fact,

8    subjected to a force placed hazard policy, then she also

9    clearly fails to meet the typicality and adequacy

10   requirements that are required under Rule 23.

11          So, given that, I am not satisfied with the

12   plaintiffs' evidence regarding this line item in this billing

13   statement.  I find, again, that Gooden's claims are not

14   typical of a hazard insurance class, and she would be

15   inadequate to represent the putative class regarding this

16   claim, and I would deny the motion to certify that subclass

17   as well.

18          Anything you want for the record?

19          MR. BERGER:  Just two brief points, Your Honor.

20          THE COURT:  Go ahead.

21          MR. BERGER:  First of all, Ms. Gooden did, in fact,

22   pay for those line items, and she was not fully refunded

23   those amounts.  SunTrust thought that it had, or attempted

24   to, but it did not fully reimburse those amounts.  And that I

25   don't really think impacts the Court's decision, but I just

1     wanted to clarify that for the record.

2           And in general, Your Honor, it's our position that,

3     again, because SunTrust's conduct with respect to hazard and

4     flood insurance is essentially the same, and they use the

5     same data, and under the Court's rulings the limitation for

6     both hazard and flood insurance is the same, replacement

7     cost, we view, whether someone was force placed flood or

8     hazard, they adequately can represent both sets of folks.

9           It's as if, for example, in a consumer class action

10    for a product, let's say a computer, and there are two

11    versions of the computer, last year's and this year's, they

12    both have the same defect, I think a class rep who has got

13    last year's version, and it's the got same defect as this

14    year's version, they can represent both of those classes of

15    people even if it's a different version of the defective

16    computer.

17          So, based on, first of all, the confusion that

18    SunTrust creates by mislabeling these things, and

19    misrepresenting what they are to consumers, and by -- because

20    we have the same standard, the same data, and the same

21    problem here as with flood and hazard, we think Ms. Gooden

22    should be an adequate class rep for the hazard insurance

23    folks as well, even if SunTrust ultimately only force placed

24    a flood insurance policy on her.

25          THE COURT:  You didn't argue that in the briefs.  I

1    don't see how that -- she wouldn't be typical -- if she -- if

2    there wasn't any force placed hazard insurance on her, how

3    would she be typical of the class?

4          MR. BERGER:  Because we've got the same standard, and

5    the same --

6          THE COURT:  That's like -- I mean, you -- we --

7    probably all of us own houses, and my -- the person that

8    holds my mortgage knows I'm not in a flood zone and I don't

9    have flood insurance.  Under your theory, though, I could

10   represent the class.  How?  Say I had a loan with SunTrust --

11         MR. BERGER:  If you received a statement that said

12   that you were being force placed with flood insurance,

13   whether or not they actually did, whether that caused you

14   some harm, either you paid them some money or --

15         THE COURT:  But it didn't cause me any harm.  At least

16   under these facts, it didn't cause her any harm at all.  So

17   how would she be typical of the class?  I mean, why would you

18   want a bunch of plaintiffs that show that they got a one cent

19   credit from SunTrust as opposed to actually paid and had

20   damages?

21         MR. BERGER:  Well --

22         THE COURT:  How would I be typical of or an adequate

23   class rep under those facts?

24         MR. BERGER:  Again, Ms. Gooden did pay.  She made

25   multiple payments based on multiple statements.

1          THE COURT:  I didn't see -- correct me if I'm wrong,

2     but I didn't see any evidence of that.  Is there --

3          MR. BERGER:  It is, Your Honor, it's in the record.

4          THE COURT:  In her deposition she couldn't produce

5     anything.

6          MR. BERGER:  I believe she did.  And we'll work on

7     finding that while we're talking.

8          THE COURT:  I've got her deposition right here.  I

9     don't recall her saying --

10          MR. BARILOVITS:  May I, Your Honor?

11          My recollection is that she did pay, and it was

12     refunded.  I think there was a delay in the refund, but she

13     did pay and it was refunded.

14          THE COURT:  Okay.

15          MR. BERGER:  Your Honor, there was an attempt to

16     refund the money.  After we filed this lawsuit, they sent her

17     a check, trying to moot the damages.  I don't think that

18     qualifies as a full refund, Your Honor.

19          MR. BARILOVITS:  I -- when you have -- I'd like to

20     address the typicality across from flood to hazard as well.

21          THE COURT:  Well, Exhibit 33 to her deposition was the

22     one that showed the charges.  And then there was another

23     statement that showed she had a one cent credit.  I remember

24     that.  So, again, how would that make her typical or an

25     adequate class rep?

1          MR. BERGER:  Again, Your Honor --

2          THE COURT:  You simply -- again, I -- I guess your

3     argument is simply having received one of these misleading

4     billing statements makes her typical and an adequate

5     representative.

6          MR. BERGER:  No.  No.  But she did pay money on it,

7     and it was not fully refunded.  And we can provide a very

8     short brief on that issue.

9          THE COURT:  You'd have to have received one of these

10    statements, you would have to have paid on it, and that would

11    be sufficient.

12         MR. BERGER:  That's correct.

13         THE COURT:  Okay.

14         MR. BARILOVITS:  May I add --

15         THE COURT:  Go ahead.

16         MR. BARILOVITS:  -- on this?

17         There are several layers, I think, of concern here

18    about Ms. Gooden representing a hazard class.

19         First of all, the charge, or the statement that's

20    referred to is, of course, again, in escrow.  It's not a

21    lender placed hazard policy.  At her deposition, I asked

22    Ms. Gooden if she could identify, and I went through a whole

23    bunch of questions, Did you ever get a letter saying your

24    hazard insurance policy was lacking?  Do you have a policy?

25    No.  Do you have --

1          THE COURT:  Right.

2          MR. BARILOVITS:  You know, that whole soliloquy of

3    questions.

4          Now, the idea that someone, if they're force placed

5    for flood, can be a representative for a hazard claim

6    ignores, in our view, a whole host of differences between

7    flood and hazard insurance.  I think the best evidence of

8    that --

9          THE COURT:  I'm not sure, are you arguing that just

10   because she was force placed for flood she's an adequate

11   class rep for someone -- for the class that was force placed

12   for hazard insurance?

13         MR. BARILOVITS:  I took his argument to say that.

14         THE COURT:  I didn't hear that.  Are you arguing that?

15         MR. BERGER:  I think so.

16         Again, Your Honor, the analogy of two versions of a

17   defective consumer product.  Just because you only bought one

18   of them doesn't mean you're not an adequate class

19   representative for both of them.  If they both have the same

20   flaw, and if the damages to class members in each case are

21   the same, and can be calculated in the same way --

22         THE COURT:  Well, except that -- we'll get to it, but

23   your proposed flood class would include plaintiffs who were

24   force placed flood insurance when their home isn't even in a

25   flood zone, right?

1            MR. BERGER:  That's correct.

2            THE COURT:  That wouldn't be Ms. Gooden, though,

3    right?

4            MR. BERGER:  It would, Your Honor, yes.

5            THE COURT:  Her house wasn't in a flood zone?

6            MR. BERGER:  Correct.  It was not in a flood zone.

7            MR. BARILOVITS:  May I make a few comments here?

8            THE COURT:  Go ahead.

9            MR. BARILOVITS:  I think the best evidence against

10   this idea that you can have a person who is force placed for

11   flood insurance being an adequate representative for a hazard

12   class is that plaintiffs from the get-go of this case have

13   divided all of their claims between flood and hazard, and I

14   think in an honest recognition that the entirety of the

15   regulatory background for hazard and flood is very different.

16   There are very many different considerations.

17            Flood insurance is regulated by federal law.  There is

18   a host of agency guidances about what lenders can and can't

19   do.  Core logic is involved on the flood side.  It's not at

20   all the same practice.  We keep hearing there is a similar

21   practice.  I'm not sure what that practice is, but there is a

22   very big difference between flood and hazard.  And this idea

23   that Ms. Hall -- Ms. Gooden was an adequate representative

24   just because she had flood is a new argument for the first

25   time, wasn't even in their briefs, and we don't think it

1    works anyway.

2         THE COURT:  You do, however, use proxies for both

3    flood and hazard insurance, though.

4         MR. BARILOVITS:  As a necessity.

5         THE COURT:  For replacement value.

6         MR. BARILOVITS:  For replacement value, yes.  As an

7    estimation tool, yes.

8         THE COURT:  Okay.

9         MR. BERGER:  Your Honor, the reason that we separated

10   the classes out is because prior to Your Honor's most recent

11   ruling we believed there were different legal standards that

12   applied to flood and hazard.  But based on Your Honor's most

13   recent order, the legal standard is essentially the same, and

14   can be applied to the facts in the same way.

15        MR. BARILOVITS:  I'd like to add one additional

16   detail.  In a footnote in the brief, I'll locate it if I

17   can --

18        THE COURT:  Your brief?

19        MR. BARILOVITS:  Yeah.  In the federal agency's

20   interagency guidance, one of the ones we quote on replacement

21   cost value, and what are the acceptable proxies, points out

22   that replacement cost value for flood and for hazard are, in

23   fact, different.  Flood insurance, apparently, will often be

24   required to cover the foundation, when that's not so true for

25   fire or hazard -- other hazard insurance.

```
1              THE COURT:  I remember that.

2              MR. BARILOVITS:  So, I think, in addition to the

3    regulatory background being different, the -- the calculation

4    of replacement cost itself will be different, and we just

5    don't feel that being placed for one is being placed for the

6    other.  And neither have plaintiffs argued that anywhere in

7    this case up until today.

8              THE COURT:  I didn't see it in the briefs.  But, okay.

9              There wasn't that specific argument in your briefs,

10   right?

11             MR. BERGER:  That is accurate, Your Honor.

12             THE COURT:  Okay.  So, that would take care of the

13   nationwide hazard, nationwide flood, and California and New

14   York hazard classes.

15             There is still a California flood class in which

16   Ms. Gooden would be typical and adequate.  I didn't see any

17   argument in the opposition with respect to the position that

18   flood insurance was lender placed on Ms. Gooden.

19             Is that fair?

20             MR. BARILOVITS:  There were policies of -- yes.

21             THE COURT:  Okay.

22             MR. BARILOVITS:  There are other arguments, we

23   believe --

24             THE COURT:  Okay.

25             MR. BARILOVITS:  But, yeah.
```

1          THE COURT:  And then I want to make sure I have this

2     one.  The other class that we haven't really discussed yet is

3     under your UCL claim, plaintiffs' UCL claim.  You want a --

4     just a California class, correct?

5          MR. BERGER:  Correct.

6          MR. BUESCHER:  Yes, Your Honor.

7          THE COURT:  Okay.  Again, that is dependent upon the

8     Court finding that Ms. Gooden would be typical and adequate,

9     setting aside other issues that we'll get to.  But, again, at

10    least initially it would require the Court to find that

11    hazard insurance had, in fact, been placed, and now you've

12    raised this new argument that even if I didn't make that

13    finding, because flood insurance was placed, she'd still be a

14    typical and adequate representative because of the force

15    placed flood insurance.

16         Did I get that right?  That's sort of the argument

17    you're making?

18         MR. BERGER:  Yes, Your Honor.

19         THE COURT:  Okay.  The problem is, that's a new

20    argument.  It wasn't briefed.  I understand it, but absent

21    further briefing and further analysis, it's not really an

22    argument I can consider.  I don't like to consider new

23    arguments simply sitting here on the bench.  If I think I

24    need additional briefing, I'll let you know, but it doesn't

25    strike me as having much merit.

1          If I don't see an argument in a brief, and a lawyer

2     raises it for the first time at oral argument, that tends to

3     make me somewhat skeptical of that argument.  If it was such

4     a good argument, I assume I would have seen it in the brief.

5          And because I have made this finding that there isn't

6     sufficient evidence that hazard insurance was force placed on

7     Ms. Gooden, and that therefore her position as the purported

8     representative of the class won't be adequate, and it's not

9     typical of the putative classes, everything that you're

10    requesting in terms of the breach of contract claim for

11    California, the 2955.5 claim, and the UCL 17200 claim, the

12    California hazard class, or classes, all of those would not

13    be certified.  And, in fact, the Court would deny, and does

14    deny, the motion to certify all those classes for those

15    reasons, and for the same reason that I've given with respect

16    to the breach of contract claim.  And that simply is that,

17    again, Ms. Gooden is not found to be typical of the hazard

18    insurance claims that the plaintiff seeks to raise.

19          Which leaves the flood insurance claim.  There is no

20    proposed New York flood class.  There is a proposed

21    California flood class.  Again, defendants haven't directly

22    challenged Ms. Gooden's claim, and they don't challenge

23    Ms. Gooden's claim, that flood insurance was lender placed or

24    force placed on her home.  It does appear there were actually

25    several flood insurance policies that were placed onto her

1  home.

2          I do have some concerns about the proposed class.  And

3  let me again read your specifics.  It would be, all persons

4  who have or had loans with defendant secured by residential

5  property in the state of California who were force placed for

6  flood insurance in excess of the amount required under the

7  Flood Disaster Protection Act on or after September 30, 2007.

8          That's the specific proposed class; is that right?

9          MR. BERGER:  Yes, Your Honor.

10          THE COURT:  Okay.  And taking that cue from Judge

11  Alsup, let me focus first on the term "residential property."

12          I have concerns that that definition might include

13  condominiums, or other -- I'm not sure what other type of

14  residential properties might be involved, but would be

15  different from, for example, Ms. Gooden's residence, which I

16  assume is a single-family residence.

17          So, would the plaintiffs be -- would the plaintiffs

18  accept a limit on that class to the particular type of

19  property involved in Ms. Gooden's loan?

20          MR. BERGER:  I think that would be all right, Your

21  Honor.  But I think that the limitation of the definition to

22  properties covered by the -- governed by the Flood Disaster

23  Protection Act might already provide that limitation, to the

24  extent such limitation is appropriate.

25          THE COURT:  Okay.  The second question I wanted to

1   raise with you is -- and Judge Alsup did this in Lane, he

2   held that the plaintiff can only represent borrowers with the

3   same type of contract, finding that claims in that case, the

4   plaintiffs' claims, would not be typical of those brought by

5   borrowers with different contracts, even if they resided in

6   California.  That involved FHA mortgages.  I think in the

7   case before me, as I recall, these are Fannie Mae/Freddie Mac

8   mortgages.

9           Would you accept that limitation as well?

10          MR. BERGER:  No, Your Honor.  We -- well, yes and no.

11          THE COURT:  Okay.

12          MR. BERGER:  We requested all form contracts from

13   SunTrust, and there is no -- and with respect to the

14   language --

15          THE COURT:  For California?

16          MR. BERGER:  For California.  And they purportedly

17   produced them.  There is no variation.  With respect to the

18   language and the issues that are at issue here, there is no

19   variation.

20          THE COURT:  No matter what type of loan it is?

21          MR. BERGER:  Right.  And in their opposition they

22   don't cite any such variation.

23          THE COURT:  You agree with that?

24          MR. BARILOVITS:  I think we did produce the FHA

25   mortgages, which are not just the language, the whole line of

1    cases trying to interpret an FHA mortgage because it has a

2    sentence about flood insurance of, to the extent required by

3    the secretary.  And there is a whole -- the Colby case in the

4    First Circuit has --

5         THE COURT:  Sorry to interrupt.  I really need

6    specific answers to questions.

7         MR. BARILOVITS:  Okay.

8         THE COURT:  So --

9         MR. BARILOVITS:  I --

10        THE COURT:  The argument was that you produced all the

11   mortgages or forms used by your client in California, and

12   they found no difference whether it was a Freddie -- a Fannie

13   Mae, Freddie Mac, or FHA; is that accurate?

14        MR. BARILOVITS:  That we produced?

15        THE COURT:  That you produced.  And there is no

16   difference in the language.

17        MR. BARILOVITS:  It's the second part that we

18   disagree.

19        THE COURT:  So, you disagree.

20        MR. BARILOVITS:  I think the FHA mortgage on --

21   specifically on flood insurance does have different language,

22   and has given rise to a number of different --

23        THE COURT:  You submitted a lot of exhibits to me.  I

24   honestly did not take the time to look at Exhibits 19 through

25   43 to see if the language was different.  So, I mean, either

1    it is or it isn't.

2            MR. BERGER:  Your Honor, we asserted that it's the

3    same.  In their opposition they didn't raise this argument.

4    This is an argument we've heard for the first time that there

5    is any variation in the language.  No specific variation was

6    pointed to in their opposition brief.  So, I'm somewhat at a

7    loss.

8            THE COURT:  Can you point to something?

9            MR. BARILOVITS:  Yes.  On -- I'm looking in my brief

10   now.

11           THE COURT:  Okay.

12           MR. BARILOVITS:  I think I did cite -- one second --

13   it's in the catchall problems, I think it's in Section 7.  On

14   page 20 at line 9 -- 8 and 9, SunTrust's loan portfolio

15   consists of borrowers with different types of mortgages,

16   including FHA loans, which have been the subject of an

17   entirely distinct line of cases interpreting the property

18   insurance provision --

19           THE COURT REPORTER:  I'm sorry, counsel, please slow

20   down.

21           MR. BARILOVITS:  -- including Federal Housing

22   Administration loans, which have been the subject of an

23   entirely distinct line of cases interpreting the property

24   insurance provision -- and I should be more specific there,

25   specifically flood.  And I think we have an O'Donnell

1    declaration, and then pointing to the McKenzie case.

2         And I'd also point out that the Colby case we cite in

3    our brief from the First Circuit was -- it was hotly

4    contested what the FHA mortgage loan allows as -- and it's

5    distinct from the Fannie Mae.

6         THE COURT:  Yeah, but the issue is, what is SunTrust

7    using.  And the allegation is you're not using a different

8    form no matter -- doesn't matter whether it's FHA or Fannie

9    Mae or Freddie Mac, your clients are using the exact same

10   form.  They didn't find any difference in that form.

11        If that is true, and you didn't oppose that, there is

12   nothing in your opposition brief that says that's not true, I

13   have to accept that allegation, at least at this point,

14   right?

15        MR. BARILOVITS:  Yes.  I mean, I'll be honest, my

16   point in this section here, and by pointing to the O'Donnell

17   declaration and the McKenzie case, was to try to point out

18   that the FHA flood insurance provision is different from the

19   Fannie Mae.  And, in fact, Judge Alsup in the Lane case, if

20   my recollection is correct, said, well, if you have a class

21   representative having one type of mortgage, they're not going

22   to be allowed to represent a class with different types of

23   mortgages.  And particularly here, I think it's very clear in

24   the McKenzie case, and in the Colby case, that the operative

25   language of an FHA mortgage is different on flood insurance

 1    than the Fannie Mae.

 2              MR. BERGER:  Your Honor --

 3              MR. BARILOVITS:  SunTrust does use both, but the

 4    question here goes to --

 5              THE COURT:  Isn't that what matters, what SunTrust

 6    uses?

 7              MR. BARILOVITS:  Yes.  They use both.

 8              MR. BERGER:  There is nothing in the record here.  And

 9    I'm looking at Mr. O'Donnell's declaration, paragraph 15,

10    which is cited, and he doesn't describe any differences in

11    the language.  He just says, we -- there were at least two

12    other kinds of mortgages and/or deeds of trust which

13    borrowers who were lender placed had signed, including

14    Federal Housing Administration mortgages.  He doesn't say

15    there are any differences between those.  And there is

16    nothing in the record on that.

17              THE COURT:  All right.  And then the other issue in

18    terms of limitations are those possible plaintiffs that, in

19    effect, never paid the force placed flood insurance charge,

20    you know, the mortgage foreclosures, or the charge was

21    extinguished.

22              Are you agreeable to that type of limitation?  That

23    was in Lane as well.

24              MR. BERGER:  Your Honor, there is one category of

25    class members that we think -- who may not have paid SunTrust

 1    on the force placed insurance, but received the threat of

 2    force placement, and then went to their private insurer as a

 3    consequence and purchased their own excessive insurance in

 4    response to those threatening letters or the threats of force

 5    placement.  Those folks have a direct -- direct harm.

 6          THE COURT:  Alsup, in Lane, found that the defendant

 7    contended in Lane that equitable defenses of waiver and

 8    voluntary payment, among others, were based on individualized

 9    facts, and that some borrowers paid less for force placed

10    policies or never paid at all.  Judge Alsup found that the

11    "success or failure of the potential defenses is susceptible

12    to common methods of proof."  And he reasoned that the

13    application of these defenses was a matter for trial or

14    summary judgment.  I agree with that.  He did find merit in

15    the defendant's claim, however, regarding reimbursed or

16    extinguished charges, and he ruled that "defining the class

17    to exclude recovered or extinguished charges is appropriate."

18          Do you disagree with that?

19          MR. BERGER:  I do not disagree with that, Your Honor.

20          THE COURT:  Okay.

21          MR. BARILOVITS:  Your Honor, may I?

22          There was an argument made, may I -- if I may respond

23    to it?

24          That there is a -- a class of people who were, quote,

25    threatened and went out and got flood insurance because they

1    got a letter.  I think as a class certification issue that

2    would be almost impossible to determine damages, or really

3    even membership in a class unless we interviewed individual

4    plaintiffs.

5         If someone went out and got more flood insurance

6    because they got a letter saying you have inadequate flood

7    insurance, I'm not sure how we would prove that on a

8    class-wide basis.

9         In addition, this is a lender placed flood insurance

10   class, now we're including -- plaintiffs are trying to

11   include people who were actually never lender placed for

12   flood insurance.

13        MR. BERGER:  Your Honor, our class certification

14   definition from the beginning has included, in a footnote,

15   for all of the classes, to be force placed means either

16   actually being charged by defendant for insurance, or being

17   forced by the defendant to purchase insurance due to a

18   threatening letter, for example.

19        And we can easily ascertain those folks, because if

20   they go out and purchase their own excess insurance, there is

21   two pieces of evidence on that in SunTrust's data.  One is

22   that SunTrust doesn't end up force placing their own

23   insurance because they receive proof of that excessive

24   insurance from the class member, and that will be reflected

25   in their own data.

```
 1              MR. BARILOVITS:  I -- again, we point out that in our
 2     brief, the problems with this -- this definition of force
 3     placed.  Plaintiffs' definition would -- if you read it
 4     literally, a force placement would include almost everyone
 5     who ever signed a deed of trust.  This would -- an expansion
 6     here would now get into proving the reasons and the -- the
 7     details of every borrower who increased their flood insurance
 8     who happened maybe to have gotten a letter from SunTrust that
 9     said you, perhaps, need more flood insurance.  I'm not sure
10     it would be at all provable on a class-wide basis.  And,
11     again, this is why we're getting into a class now of people
12     who were never lender placed at all.  Now we're expanding it
13     to those who may have gotten a letter about flood insurance
14     and went out and bought more themselves.  I don't think any
15     court has ever defined force placed insurance so broadly.
16              THE COURT:  Has a court so defined?
17              MR. BERGER:  No.  But I think it's a simple matter
18     of -- of consequential damages, of, in any case, if I get a
19     threatening letter telling me I'm going to get this massive
20     policy force placed on me if I don't go out and buy more
21     insurance, I might go out and buy more insurance.  And there
22     is --
23              THE COURT:  And you have to send proof to SunTrust.
24              MR. BERGER:  I send proof to SunTrust and they record
25     it.
```

1           THE COURT:  So why wouldn't that be easily

2     ascertainable?

3           MR. BARILOVITS:  It would get into the motivations of

4     each individual borrower.  It goes back to the point they

5     spoke earlier about, the confusion from the escrow statement.

6     A confusion is something you have to get into the mind of

7     each borrower.  Here it would require an investigation into

8     the motivations of each borrower who went out and got more

9     insurance.

10          THE COURT:  Got a letter from SunTrust that said I

11    didn't have adequate flood insurance, I went to USAA and got

12    a flood insurance policy and I sent it to SunTrust and they

13    backed off.

14          MR. BARILOVITS:  It is -- it -- take Ms. Gooden for an

15    example.  We think what happened with her is that her flood

16    insurance actually fell a few thousand dollars into her

17    hazard insurance.  So, in fact, there was some indication

18    that her flood insurance was inadequate.

19          If that happens, if that is pegged in some database

20    somewhere, and a person receives a letter from SunTrust

21    saying you need more flood insurance, and the person goes

22    out.  They also could have been told by their own insurance

23    agency, I've noticed something here, you have less flood

24    insurance than hazard insurance, and we don't think that ever

25    should be the case.  And how would we separate those from a

1    class?  It would just be a presumption that they did it

2    because of SunTrust.  And that would, again, get into we'd

3    have to investigate --

4            THE COURT:  Let me follow up on that.

5            Speaking from personal experiences, how would you

6    separate that person, when instead of getting a letter from

7    SunTrust gets a letter from their own insurance saying looks

8    to us like you don't have enough flood insurance?

9            MR. BERGER:  I think --

10           THE COURT:  How do you distinguish that person?

11           MR. BERGER:  I think the chances of that having

12   happened are slim to none.  I mean, you just look at the

13   basic timing --

14           THE COURT:  You own a house?

15           MR. BERGER:  What's that?

16           THE COURT:  Do you own a house?

17           MR. BERGER:  I do.

18           THE COURT:  It's insured?

19           MR. BERGER:  It is.

20           THE COURT:  I don't know about you, but I get a lot of

21   letters from my insurance company.

22           MR. BERGER:  This is --

23           THE COURT:  Not from my mortgage holder, but from my

24   insurance company.

25           MR. BERGER:  That's true.  I think just --

 1          THE COURT:  So, how do I separate out those plaintiffs

 2    from your definition of force placed?

 3          MR. BERGER:  Because the initial coverage amount in

 4    the data, pre-letter, will be sufficient.  So, if there is an

 5    increase above what was sufficient --

 6          THE COURT:  But how would I know why they increased

 7    their flood insurance?

 8          MR. BERGER:  Just based on the timing.

 9          MR. BUESCHER:  Your Honor, one other point here is

10    that the people in that class would be limited to people who

11    did receive the threatening letter from SunTrust saying, in

12    Ms. Gooden's case for example, you need either 45,000 or

13    $25,000 additional insurance.

14          THE COURT:  You would require a letter from SunTrust?

15          MR. BUESCHER:  Yes.  And SunTrust tracks when they

16    send those -- or QBE, on behalf of SunTrust, tracks when

17    those letters -- when they start the force placed lender

18    cycle.

19          MR. BARILOVITS:  Again, not to belabor the point, Your

20    Honor, but in Ms. Gooden's case, at least in the initial

21    lender placement for flood, she was, in fact -- it did appear

22    she had insufficient flood insurance.  It could --

23    plaintiffs' counsel's view that it's just a matter of timing

24    is, in my view, and SunTrust's view, presumptuous.  They

25    could totally have gotten a letter from their insurance

```
1   agency saying we've noticed your flood insurance has fallen

2   behind your hazard insurance, and my understanding --

3            THE COURT:  Hang on.  You deposed Ms. Gooden, right?

4            MR. BARILOVITS:  Yes.

5            THE COURT:  Did she get a letter from SunTrust saying

6   your flood insurance is inadequate?

7            MR. BARILOVITS:  Yes, she did.

8            THE COURT:  So, why are we arguing about her?

9            MR. BARILOVITS:  For example.  I'm saying if --

10  because in her -- in fact, in her example, she, in fact,

11  appears to have --

12            THE COURT:  Slow down and move closer to the mike.  My

13  court reporter is sighing.

14            MR. BARILOVITS:  She appears actually to have had

15  insufficient flood insurance at one time, and I'm simply

16  pointing to her as an example that the insurance agents, and

17  maybe it didn't happen in her case, but it's totally

18  foreseeable there is a -- that when SunTrust sends out a

19  letter saying you have insufficient flood insurance, and my

20  understanding is that the way it works is that the -- they

21  track replacement -- replacement costs for hazard and flood,

22  and if flood falls below hazard, they simply send out a

23  letter.  So, in those circumstances, the likelihood is those

24  people do have insufficient flood insurance.

25            That is totally foreseeable.  I don't think it's a
```

1    matter of presumption, of timing.  It's totally foreseeable

2    that if an insurance agent is doing their job, separate from

3    SunTrust, they're going to notice that themselves and say,

4    you've got insufficient flood insurance, you need to get some

5    more.

6              THE COURT:  I understand the argument.

7              Which brings us full circle to this argument about

8    replacement costs and replacement value.  I want to focus on

9    that, because it's discussed at length in both briefs, and it

10   does affect -- would affect this class as well.

11             It is the defendant's main argument in the opposition

12   that this class, and all the other classes, would require

13   determination of the replacement value of the class members'

14   homes, and that's a calculation that the defendant contends

15   is "inherently individualized" and cannot be determined on a

16   class-wide basis.  The defendant contends that this would

17   result in deficiencies in the ascertainability of the class,

18   the commonality, predominance and superiority requirements.

19             As indicated, implicit in Rule 23 is the requirement

20   that the class or classes must be clearly ascertainable.  And

21   there is a general rule in the Ninth Circuit that the need

22   for individualized damage calculations alone -- although the

23   general rule is that individualized damage calculations alone

24   cannot defeat class certification, the Supreme Court in the

25   Comcast case found that a plaintiff seeking certification

1  must present an adequate model for determining damages on a

2  class-wide basis in order to meet the predominance

3  requirement.  The model need not be exact, but it must

4  present -- plaintiff must present a model that establishes

5  consistency between the plaintiff's damages case with its

6  liability case.  This determination must be made even if the

7  court's analysis would also be pertinent to a merits

8  determination.

9       The plaintiff has argued that the class is

10  ascertainable.  Focusing on just the California flood

11  insurance class, it would be ascertainable, in relevant part,

12  by analyzing the replacement cost value of the class members'

13  properties at the time an insurance policy was force placed.

14  Plaintiffs argue that the Court could use the value that

15  defendant uses in its own system for determining replacement

16  value.  Plaintiff admits the defendant doesn't actually

17  calculate replacement costs on its own, but does, in fact,

18  use proxies, including a borrower's "last known voluntary

19  coverage amount."  Plaintiff contends it does not matter what

20  proxy is used by defendant.  Plaintiffs argue, "Because

21  defendant tracks the data of the amount it uses as the proxy,

22  a comparison between the proxy for replacement cost can be

23  made in order to determine the maximum amount of insurance

24  defendant can force place."  Plaintiff argues the use of

25  defendant's proxies are appropriate for determining whether

1    defendant has force placed insurance in excess of the

2    contractual statutory maximum because it's the same way the

3    defendant tracks its "portfolio of over 800,000 loans to

4    ensure they have adequate insurance."

5         Defendant argues that plaintiff's plan to use

6    defendant's own proxy for replacement value is inappropriate

7    for a number of reasons.

8         Defendant has submitted a report from an expert,

9    Richard Baum, he's a former Chief Deputy Insurance

10   Commissioner for California, the California Department of

11   Insurance, and he has rendered an opinion on whether the

12   California Department of Insurance has established a

13   consistent definition for the term "replacement cost," and

14   whether that definition requires individualized consideration

15   of each dwelling.  Mr. Baum stated that replacement cost is

16   not a static number, but rather one that requires

17   consideration of ever changing variables, and which "does not

18   lend itself to the simple application of previously fixed

19   numbers."

20        He states specifically that, "The Department of

21   Insurance historically has resisted allowing an insurer to

22   use previously fixed numbers such as homeowner's outstanding

23   loan balance or last selected coverage amount as a surrogate

24   for replacement coverage.  While such fixed numbers may be

25   equivalent to replacement cost under some circumstances,

1    under other circumstances they will not be.  There are simply

2    too many variables that can render the borrower's last known

3    voluntary coverage amount an inaccurate reflection of

4    replacement cost."

5            Additionally, defendant has pointed to regulations

6    recently promulgated by the California Department of

7    Insurance which lays out many factors that should be examined

8    in determining replacement value.  It also suggests that the

9    methodology of using last known coverage may even be

10   prohibited by California law.  And that's on page 14 of the

11   opposition brief.

12           And so when I started the hearing out, there wasn't

13   really a lot of -- and there isn't any case law that gives

14   the Court a lot of guidance with respect to this argument,

15   but if I were to reject the plaintiffs' proposed plan to

16   determine replacement value based on the proxies, plaintiffs

17   would never be able to certificate any class in these types

18   of cases, right?  I mean, there -- it would foreclose any

19   type of class action.

20           MR. BARILOVITS:  Well --

21           THE COURT:  It's a big argument.

22           MR. BARILOVITS:  I agree it's a big argument.  I would

23   suggest, though, that there are certain types of cases that

24   are so individualized that they're not susceptible to

25   class-wide proof.

1            And our arguments on the replacement cost aren't -- we

2       turn to the California Department of Insurance to list all

3       sorts of factors that have to go into it.  We cite cases

4       where people are over $1.5 million behind on their

5       replacement cost as shown on their coverage, I agree, but

6       there are certain types of cases that it doesn't mean that

7       the plaintiffs who were placed in excess of replacement cost

8       have no option.  They can bring a suit to recover from the

9       lenders individually.

10           Yes, it doesn't mean -- maybe it means this kind of

11      class action is not suitable, but it doesn't mean the

12      plaintiffs are completely -- not every case can be certified.

13           THE COURT:  But isn't it a bit unfair that SunTrust

14      can send out a letter based on a proxy value that says your

15      insurance is inadequate, yet you're saying -- and the letter

16      is a standard form letter, it's sent to everyone, it's almost

17      identical in every case, and yet you're saying you can't --

18      even though we can do that in a rote fashion, or SunTrust can

19      do that, you can't, as a class, bring a lawsuit against us

20      using the same information?  It seems -- doesn't it seem a

21      bit unfair?

22           MR. BARILOVITS:  Not particularly.

23           THE COURT:  What's good for the goose is good for the

24      gander.  Isn't that the saying?

25           MR. BARILOVITS:  My -- I think we put this in our

1   brief, and, in fact, Wade Hardcastle put it in his

2   declaration, that when we send these letters, and we place

3   insurance -- QBE, I should say, sends letters, and just like

4   the insurers, CastlePoint and State Farm actually tell their

5   insurer this, the same thing, we are estimating your

6   replacement cost, you may challenge this.  If, for example,

7   we got it too high, if we got it too low, if somewhere it's

8   wrong, please tell us and you can order an appraisal.  As a

9   matter of practicality, it's not really possible in the

10  lender placed insurance arena to do an appraisal.

11          THE COURT:  Does the letter -- pardon me for not

12  remembering what the letter says exactly.  Does the letter,

13  in effect, say -- again, most letters, I believe, give the

14  insured 60 days to do something, there is a period, you don't

15  immediately force place insurance.  And in effect it says,

16  our records would indicate that there is inadequate flood

17  insurance on your property, does it state actually the

18  estimated replacement value or replacement cost of the home

19  in the letter and then give the homeowner an opportunity to

20  challenge that?

21          You just told me that if your client's estimate is

22  wrong, then the homeowner would have an opportunity to

23  challenge even that estimate before being force placed.

24          Is that really how it works?

25          MR. BARILOVITS:  My understanding is that -- and I

1  understand the question.  And I'll be honest, I'm not quite

2  sure.  The estimation of the replacement cost -- and there is

3  a detail here I'll get into after this.  The estimation of

4  what the required amount of insurance is is sent through the

5  borrower, so the borrower will know what the lender, or QBE

6  here, would estimate their replacement cost to be.

7        THE COURT:  It is sent -- you said borrower.  I call

8  them homeowner.

9        MR. BARILOVITS:  The homeowner, yeah.

10        THE COURT:  In the letter?

11        MR. BARILOVITS:  Well, in -- I'd have to look -- I'll

12  be honest, I'd have to look at the letter to say what exactly

13  is said.  But I'm pointing to a notice that Wade Hardcastle

14  has declared that he sends, or QBE sent, to all of -- anyone

15  who was force placed by QBE, and --

16        THE COURT:  Again, focusing just on flood insurance.

17        MR. BARILOVITS:  Yeah.

18        THE COURT:  Did you submit any of the letters?

19        MR. BERGER:  Your Honor, we're looking for the same

20  thing.  I don't recall seeing anything, with respect to

21  Ms. Gooden or Ms. Hall, telling them this is our calculation

22  of your replacement costs, and you can challenge it by doing

23  X, Y and Z.  But I could be wrong.

24        MR. BARILOVITS:  Yeah, I think Exhibit D to -- I'm

25  sorry.  Exhibit C to Wade Hardcastle's declaration is

1    actually a document, it looks -- appears that it was produced

2    by Sheila Gooden in this case, from QBE, who forced placement

3    to her, and it says, To determine the amount of lender placed

4    insurance, we have --

5              THE COURT:  Slow down.  Slow down.

6              MR. BARILOVITS:  I'm sorry.  To determine the amount

7    of lender placed insurance, we have obtained current

8    information regarding the property improvements securing your

9    loan from available public records.  Using this information

10   and standard methods to calculate the replacement cost or

11   value, we have determined the estimated replacement value.

12             THE COURT:  It is in there.

13             MR. BARILOVITS:  We believe this amount approximates

14   the replacement value of your property improvements, but the

15   actual replacement value may differ.  If you disagree with

16   the amount of lender placed insurance coverage, please

17   provide us with documentation showing the current replacement

18   value of your home.

19             So --

20             THE COURT:  There is a number in there.

21             MR. BARILOVITS:  Yeah.  This actually, honestly --

22   this was part of the lender placed insurance package that

23   went to Ms. Gooden.

24             THE COURT:  Okay.

25             MR. BARILOVITS:  We just pulled off this letter and

 1    put it to Wade Hardcastle's.

 2             If I may address the point in another way, too.

 3             THE COURT:  Okay.

 4             MR. BARILOVITS:  If the legal limit -- and there is a

 5    whole issue here about what exactly is the legal limit.  But

 6    if the legal limit is, in fact, replacement value or

 7    replacement cost, that is -- let's say that's the law, if a

 8    business uses an estimation, or a method to estimate, and we

 9    tell them it's an estimate, as a matter of practicality, and

10    because -- especially in the lender placed insurance arena,

11    there is simply not the time to conduct an appraisal, that --

12    if -- to certify a class here would actually be changing the

13    law to allow a class to be certified based on the presumption

14    that the legal standard is not replacement value but a

15    particular kind of estimate.

16             And we think that runs square into Wal-Mart, and also

17    square into Comcast as well, putting aside all of the

18    difficulties with the last known coverage amount issue that

19    we pointed to in the brief.

20             THE COURT:  Argument being, Mr. Berger, this is in the

21    opposition, "plaintiffs' proposed 'proxy' for replacement

22    cost fails to meet the Comcast test.  It was prohibited for

23    use by the state of California, it is specifically disclaimed

24    by the insurers," and, as pointed out by Mr. Baum, "it cannot

25    be used dependably on a class-wide basis.  Plaintiffs 'fall

1    far short of establishing that damages are capable of

2    measurement on a class-wide basis.  Questions of individual

3    damage calculations will inevitably overwhelm questions

4    common to the class.'"

5           MR. BERGER:  Your Honor, I think Your Honor hit the

6    nail on the head, what's good for the goose is good for the

7    gander here.

8           THE COURT:  It's got to be legal.

9           MR. BERGER:  Right.  Yeah.  Goose v. Gander, 1978.

10          THE COURT:  That's right.

11          MR. BERGER:  Under SunTrust's theory, the only way to

12   know if SunTrust has force placed amounts in excess of

13   replacement costs would be to burn down all class members'

14   houses and rebuild them, and then look at how much it

15   actually costs to rebuild them.  I know that sounds silly,

16   but --

17          THE COURT:  You can get an appraisal.

18          MR. BERGER:  -- it is --

19          Yeah, but the appraisal is just an estimate as well.

20          When the regulations talk about replacement value or

21   replacement cost, when SunTrust's owns internal documents

22   talk about replacement cost or replacement value, they're

23   talking about a valid estimate of replacement cost.

24          The issue here for the jury is did SunTrust place more

25   than a valid estimate of replacement cost on class members.

1    And how do we get the valid estimate of replacement cost?

2    The same way SunTrust does, the same way QBE does, the same

3    way their data does, their internal policies describe it,

4    it's last known coverage amount.  That's what their deponent

5    said.

6           I want to focus on Exhibit 42 to Mr. Buescher's

7    declaration.

8           THE COURT:  Okay.

9           MR. BERGER:  This is QBE's policy, and it says it went

10   into effect in 2003.  This particular document is dated 2011,

11   right in the heart of our class period.  And it says, over

12   and over, that we determine how much insurance coverage is

13   adequate to meet SunTrust's requirements based on government

14   sponsored entity guidelines.  We do that by using the last

15   known coverage as the proxy, parentheses, substitute, for the

16   replacement cost of the property improvements.

17          THE COURT:  Your class definition then would change

18   slightly, so it would be all persons who had loans with

19   defendant secured by residential property, state of

20   California, who were force placed for flood insurance --

21   well, you say, actually, in excess of the amount required

22   under the Flood Disaster Protection Act on or after

23   September 30, 2007, right?  That's the class?  And the Flood

24   Disaster Protection Act includes language involving

25   replacement cost.

1           MR. BERGER:  Or the $250,000.

2           THE COURT:  Or the $250,000.  It doesn't say estimate

3    for replacement cost.

4           MR. BERGER:  Right.  But --

5           THE COURT:  But you want me to, in effect, allow the

6    class based on an estimate of replacement cost.  I mean,

7    that's sort of the argument the defendants are making that I

8    would be changing the law.

9           MR. BERGER:  It's not a change to the law.  That's

10   what replacement cost is.  It's an estimate.  When State Farm

11   comes up with a replacement cost, it's an estimate.

12          THE COURT:  Does it say that in the Flood Disaster

13   Protection Act --

14          MR. BERGER:  No.  I --

15          THE COURT:  -- that a court can use an estimate?

16          MR. BERGER:  I don't think it needs to say that.  When

17   we talk --

18          THE COURT:  It doesn't say I can't, I assume is your

19   argument.

20          MR. BERGER:  Right.  When we talk about replacement

21   cost in this context, we're talking about a valid estimate of

22   what it's going to cost to rebuild your home in the event of

23   a catastrophe.  It's an estimate.  And last known coverage

24   amount is an amount that is put together by an insurance

25   agent using the tools that are required by the Department of

1    Insurance, and using the criteria.  So, that last known

2    coverage amount is that sophisticated estimate that Mr. Baum

3    says has to be used.

4        THE COURT:  But Mr. Baum actually says it's not an

5    estimate.  I think there are 14 criteria, as I recall, that

6    he sets forth.  And if you take into consideration those 14

7    criteria, it moves from being an estimate to replacement

8    value.  That's, in effect, the argument.

9        MR. BERGER:  And last known coverage amount is

10   determined using those 14 factors.

11       MR. BARILOVITS:  I'm not sure there is any evidence in

12   this file of that.

13       In fact, we point in our case to a couple of cases,

14   and again, in which last known coverage amount was way off.

15   Mr. Baum in his declaration points out that last known

16   coverage amount is, in fact, sometimes inaccurate.

17       There are a host of methodologies and approximation

18   methods that lenders and insurers can use.  They have chosen

19   one, one that happens to have been forbidden in California,

20   for SunTrust.  So, there even is a question of a doctrine.

21   But putting that aside, it's not -- I don't know where the

22   idea of last known coverage amount comes from the 14 factors.

23   It's simply the amount of insurance that the borrower

24   voluntarily got.  And, as we pointed out, and Mr. Baum points

25   out, that sometimes is way off.

1          THE COURT:  But the argument is you're using an

2    estimate or a proxy, it's not the actual replacement cost,

3    and a homeowner or borrower can challenge that.  And the only

4    way a homeowner or borrower, as far as I know, can challenge

5    that is normally you get an appraisal.  And plaintiffs'

6    argument is, an appraisal is also an estimate.  So, I give

7    you my estimate, you have your estimate, there never really

8    is a replacement cost.  That's the argument.  So, it's just

9    semantics.

10          MR. BARILOVITS:  I partially agree.  You can get

11   closer and closer estimates to what it would actually cost to

12   rebuild a home, yes.  The figure is always changing.  But in

13   the lender placed insurance -- the overriding theme here is

14   that if a business uses an estimation or a proxy as a matter

15   of necessity, then we go to trial, can the Court simply use

16   that proxy or estimate to determine liability when liability

17   is, in fact, replacement cost.  And the proxy that they're

18   choosing to use has been disclaimed by the California

19   Department of Insurance, and it's undependable, and there's

20   been -- it would actually be an inquiry into the individual

21   components of each borrower's home.

22          So, it's not that a plaintiff who was placed above

23   replacement cost, or an accurate estimate of it, would --

24   would they be without relief, it's just that it's simply not

25   a kind of claim that can be brought on a class-wide basis.

1    And that's why this Spagnola case in New York said that in

2    determining the individual components of a person's home

3    including the replacement cost bars class certification.

4         The idea that we're using a proxy, and that suddenly

5    is transferred or transformed into the law, I think runs

6    right into Wal-Mart and right into Comcast.

7         MR. BERGER:  Your Honor, Mr. Barilovits has said

8    repeatedly now that California law prohibits the use of this

9    technique.  That's just simply not true.  He's making that

10   statement based on a series of correspondence from ten years

11   ago between one of QBE's predecessors and the Department of

12   Insurance in an application filed.  It's attached as Exhibit

13   B to Mr. Hardcastle's declaration.  This applies to a

14   commercial fire policy and procedure.  This has nothing to do

15   with residential flood or hazard insurance.  And they've

16   cited it over and over again, and I think it's a little

17   misleading because it has nothing to do with what we're

18   talking about here.  It's a commercial fire policy.

19        THE COURT:  It may not -- it's Mr. Baum's opinion.

20        MR. BARILOVITS:  Yes.

21        THE COURT:  It's -- there is nothing -- no court has

22   accepted that it's a violation of the law.

23        MR. BARILOVITS:  Yes.  Let me point out that --

24        THE COURT:  There are regulations you point out,

25   promulgated by the Department of Insurance, which lay out the

KIMBERLY M. BENNETT, OFFICIAL COURT REPORTER, USDC -- (916) 442-8420

1    many factors that should be examined in determining

2    replacement value, and that's in the California Code of Regs,

3    Title 10, Section 2188.65.  I assume that's what you're

4    referring to.

5         MR. BARILOVITS:  That's right, Your Honor.

6         But I'd also like to point out that this protestation

7    that it's completely irrelevant is not quite true.

8         It is, in fact, the policy that SunTrust placed hazard

9    insurance policies in the state of California under -- and

10   SunTrust, or QBE, was required to follow what the California

11   Department of Insurance said, and not to use last known

12   coverage amount.

13        Now, granted it was for hazard.  Flood is different.

14   But, conceptually, there is no reason to believe, in fact,

15   flood makes it more complicated, because as we said before

16   there is -- the replacement cost might be -- they have to

17   cover foundations, that would be a 15th factor that would

18   have to be determined.  Conceptually, if we don't apply it,

19   Mr. Baum's opinion, and Mr. Baum's declaration as an expert

20   in insurance, surely -- I think it's a common sense point,

21   how much would it cost to replace a home may be way different

22   than what that person's last known voluntary coverage amount

23   is.

24        THE COURT:  Okay.  Mr. Berger, go ahead.

25        MR. BERGER:  Again, Your Honor, not only is this a

1    hazard policy, this -- this policy from the Department of

2    Insurance and this correspondence, it's a commercial policy.

3    It doesn't have anything to do with residential.

4        Taking a step back here, SunTrust has used last known

5    coverage amount to purportedly use -- to force place millions

6    of dollars of force placed insurance on homeowners in

7    California.  And now they're claiming that that same standard

8    that they've used to burden thousands of homeowners in

9    California can't be used to allow those homeowners to get

10   remedy where it's been done improperly.  It doesn't make

11   sense, Your Honor, and would be unfair.

12       MR. STEINER:  Your Honor, could I -- I'd like to try

13   to address this point.

14       If we had an individual case here of an individual

15   homeowner who came into court and said, I was lender placed

16   too much coverage, you know, it's more than my replacement

17   cost value --

18       THE COURT:  Take Ms. Gooden.

19       MR. STEINER:  Ms. Gooden.  Anybody.

20       THE COURT:  Ms. Gooden is here.

21       MR. STEINER:  Ms. Gooden's is here among us.

22       Your Honor would have to conduct a trial and make an

23   adjudication of what is the actual replacement cost value of

24   that property, and was the amount of insurance that was force

25   placed too high.  And you would have to look at things like

1   an appraisal submitted by an appraiser.  The parties could

2   bring in contractors who inspected her house and said, this

3   is the condition of her house, this is how much it cost to

4   build it based upon the various unique factors of her house.

5   That's what Your Honor would have to do to decide that claim

6   because the standard is replacement cost value.

7        Now, what's happening here is the plaintiffs are

8   saying, well, because we want to get a class action, let's

9   not actually make a -- an adjudication of the actual

10  replacement cost value of all these houses, let's use a

11  substitute, let's use an estimate, because it's a lot easier

12  and it allows us to get a class action certified.

13        But you can't do that.  That's what Wal-Mart versus

14  Dukes and Comcast versus Behrend has said.  You can't change

15  the substantive legal standard by which the Court, be it the

16  judge or the jury, has to decide liability in order to

17  facilitate a class action.

18        THE COURT:  But SunTrust uses last known coverage

19  amount to make an initial determination as to whether the

20  flood insurance is sufficient or not, right?

21        A letter is not going to go out unless SunTrust thinks

22  the insurance is insufficient, so SunTrust has to rely on

23  some number to make a determination that the flood insurance

24  is deficient.  That number is this proxy number, right?

25        MR. STEINER:  They are -- I believe that's correct,

1   Your Honor.  They are tracking the continued existence of

2   coverage based upon the prior coverage that the borrower got.

3   So, they look at what the borrower had and they say, as long

4   as the borrower continues to have that amount of coverage,

5   we're leaving them alone, we're not -- that's it, that's good

6   enough.

7          THE COURT:  So I've got a flood insurance policy for

8   $400,000, and then I keep that for five years, and then I go

9   out and get a flood insurance policy for 350,000, that then

10  would trigger something -- would trigger a letter?

11         MR. STEINER:  Right.

12         THE COURT:  And the letter, in effect, says, either

13  you bring your insurance up to 400,000 or we're going to

14  force place an additional $50,000 on your property.  And then

15  the issue is, is that excessive, right?  And it's only

16  excessive if it exceeds the replacement cost of the home,

17  right?

18         MR. BERGER:  Correct.

19         THE COURT:  And I say to you, what's the -- what's the

20  value of the replacement cost of this home?  You tell me it's

21  what?

22         MR. BERGER:  I'm sorry, I didn't catch the numbers.

23         THE COURT:  What's your proof as to the replacement

24  cost of the home?

25         MR. BERGER:  What were the numbers in the

1   hypothetical?

2          THE COURT:  I originally had 400,000, I moved it down

3   to 350, that triggered the letter, and they're going to --

4   and they force placed an extra 50,000.

5          MR. BERGER:  It's 350.  It's the last known privately

6   placed coverage amount.

7          THE COURT:  That's what you would say would be the

8   replacement cost?

9          MR. BERGER:  Yes.

10         THE COURT:  Why can I use that?

11         MR. BUESCHER:  That amount was determined --

12         THE COURT:  They come in with a contractor that says,

13   no, no, it really should be 450,000.  Who wins that lawsuit?

14         MR. BERGER:  In an individual case?

15         THE COURT:  Yeah.  So, you say to me, Judge, the

16   replacement cost is really 350, they force placed an extra

17   $50,000, that's unlawful, my client is entitled to damages.

18   They say, wait a second, no, we have a contractor who went

19   out and saw that house, that house is worth -- or at least

20   should have flood insurance of $450,000, right?  If that's

21   the evidence before the Court, don't they win?  So, really,

22   doesn't it come down to you need an appraisal or a contractor

23   to come in and give me the replacement value?

24         MR. BERGER:  No, Your Honor.

25         THE COURT:  I'm asking, how are you going to prove

1    your case?

2         MR. BERGER:  If this were an individual case or a

3    class case, we present to the jury, this last known coverage

4    amount is what State Farm or Allstate or Farmers decided was

5    the appropriate amount of coverage.  That's what they do.

6    Private insurance, that's what they do, they use --

7         THE COURT:  You bring in Mr. State Farm, he says, that

8    house needs 350.

9         MR. BERGER:  And they're required to use the 14

10   points, or whatever it is, if they're in California.

11        THE COURT:  Okay.

12        MR. BERGER:  And SunTrust uses that same amount when

13   they're determining --

14        THE COURT:  But now I'm in trial, SunTrust says, I'm

15   going to get a contractor.  Contractor comes in and says

16   State Farm doesn't know what they're doing.

17        MR. BERGER:  I think the jury is entitled to disregard

18   any of that evidence and any of that testimony because that's

19   not what they, in fact, use to determine how much insurance

20   to force place.

21        THE COURT:  Sort of an estoppel argument.

22        MR. BERGER:  I think so.

23        MR. BARILOVITS:  Again, there is a difference between

24   a business using approximation methods and the law.  The law

25   is, if the law is, in fact, replacement cost value for flood,

1    SunTrust hasn't violated any law.  It may have violated it's

2    own approximation methods at most.  Even then, there is a

3    statement saying, this is an estimate, please tell us, please

4    give us more information.

5          As far as State Farm goes, this idea that we relied

6    upon State Farm, I pointed out in the brief a study done by

7    State Farm itself that found out that there was -- 20 percent

8    of its insureds were underinsured.  In other words, the last

9    known coverage amount didn't equal replacement cost.  Could

10   it be said, in the circumstance where a person is

11   underinsured deliberately, accidentally, that SunTrust

12   violated the law if, in fact, the last known coverage amount

13   was not above replacement cost?  The answer would have to

14   be --

15         THE COURT:  You're going way too fast.

16         MR. BARILOVITS:  In that particular case, where a last

17   known coverage amount is above or -- is less than replacement

18   cost, and we force placed that amount, SunTrust didn't, in

19   that particular case, violate any law at all, and those

20   people are going to be swept up into this class with everyone

21   else.  This is just a methodology that makes it easier for

22   class certification but, as a matter of law, it just doesn't

23   work.

24         MR. BERGER:  Your Honor.

25         THE COURT:  Go ahead.

1          MR. BERGER:  We could sit here for hours and think of

2     scenarios and class members where the situation may vary a

3     little bit, and the dollar figures don't quite align with our

4     theory.  In any class action you can do that.  In any class

5     action there is going to be imperfections.  If this was a

6     defective computer class and the batteries don't work, there

7     might be one class member out of a thousand who accidentally

8     threw the laptop on the ground and that's why the battery

9     broke.  But the law still allows class actions, even if there

10    is some scenario, some picture we can paint in a unique

11    situation, where the class action model might not be a

12    hundred percent perfect.  And that's what we're doing here.

13         But SunTrust uses this as a proxy, undeniably, over

14    and over again, and we should be allowed to as well.

15         MR. BARILOVITS:  I'd like to point out, this isn't

16    just -- first of all, yes, we could spend forever talking

17    about the individual characteristics of replacement cost for

18    the class members' homes.  And, in fact, we should.  As a

19    matter of due process, SunTrust would have that right.

20         Even for Ms. Gooden, I think, and I'd have to go back

21    and honestly look at the deposition transcript, but I asked,

22    Do you have any buildings not covered by the insurance?  The

23    answer was yes.  Would those be included?

24         Honestly, to determine what is Ms. Gooden's

25    replacement cost, what was it when we force placed her, it's

1  nowhere in the record.  Did we violate the law when we force

2  placed her?  It's not stated anywhere in the record what

3  Ms. Gooden's or Ms. Hall's replacement cost was.  We pointed

4  out in the brief, when I asked Ms. Hall in her deposition,

5  What is the replacement cost for your home?  The objection

6  was, this calls for expert testimony.  In fact, it would for

7  every single class member.

8       THE COURT:  But in Ms. Gooden's case, you use the last

9  known value or last known insurance, right?  You did use

10  that, right?

11       MR. BARILOVITS:  Yes.  Again, as an estimation tool.

12  But there is no -- even in Ms. Gooden's particular case,

13  plaintiffs have not said anywhere in their motion --

14       THE COURT:  Last known coverage amount.  So, for

15  Ms. Gooden you used her last known coverage amount.

16       MR. BARILOVITS:  Yeah.  That goes back to, yes, but

17  did we violate the law in any way.  And where is the proof,

18  even in Ms. Gooden's case, even in Ms. Hall's case, where did

19  we go above replacement cost?

20       If they say that it's easy, that the law -- there is a

21  difference -- again, the key difference is, there is a

22  business methodology that uses -- that we can approximate.

23  That does not mean in a court of law, in front of a jury, we

24  should be held liable for violating the law when it involves

25  replacement cost.  There is no evidence.

 1          Trying to think of an analogy.  It's sort of like if

 2    you were driving on a highway --

 3          THE COURT REPORTER:  Sir, please.

 4          MR. BARILOVITS:  I'm sorry.

 5          If you were driving down the highway, and you didn't

 6    know what the speed limit was, and you had seen maybe a sign

 7    maybe ten miles back, and it said 55, so you use 55.  You're

 8    going to say, I'm going to be conservative and use 55.  You

 9    get pulled over and the police asks, How fast were you

10    driving?  You say, I don't know what the speed limit is here.

11    I was going 55.  I thought it was 55.  He tickets you for --

12    because you were going 60.  Is that a violation of the law

13    if, in fact, the speed limit of that stretch of the highway

14    was 65 because I violated my own estimation of what the speed

15    limit was here?  No.  I only get a ticket if I go 65.  That's

16    the law.  If I get a ticket for violating my own proxy for

17    what the speed limit is, I'm not sure anyone would say that's

18    a violation of the law in any sense.  It's the same thing

19    here.

20          THE COURT:  How do you prove the violation?

21          MR. BERGER:  There is the -- there is, essentially,

22    three points of data in SunTrust's data:

23          There is last known privately placed coverage amount.

24    They take a snapshot every month of the data.  So, month by

25    month we've got -- we can get what's in their system for

1    privately placed insurance amount.

2              THE COURT:  Okay.

3              MR. BERGER:  There is a data field for -- that dates a

4    lapse of insurance.  And there is a data field that shows the

5    amount that they force placed.  And --

6              THE COURT:  Okay.

7              MR. BERGER:  And when that amount exceeds --

8              THE COURT:  When what amount?

9              MR. BERGER:  When the amount they force placed exceeds

10   their own data of last known coverage amount, that's a

11   violation.

12             THE COURT:  I'm not following.  Use numbers.

13             MR. BERGER:  Sure.

14             THE COURT:  Use hypothetical numbers.

15             MR. BERGER:  Let me give some numbers.  So, let's say

16   in their system the last known coverage amount says $100,000.

17             THE COURT:  Okay.

18             MR. BERGER:  And then the system says they don't have

19   proof of current insurance, and so they force place a hundred

20   thousand dollars in insurance.  There is no violation there.

21             THE COURT:  There is no violation.

22             MR. BERGER:  No violation.

23             THE COURT:  Right.

24             MR. BERGER:  So then the next line says last known

25   coverage amount is 100,000, and the system says there is a

1   lapse, there is no proof of insurance for a period, so they

2   place 120,000.  That is a violation.

3          THE COURT:  Oh, because they went above a hundred.

4          MR. BERGER:  Right.  That's the most basic

5   hypothetical.

6          THE COURT:  And your argument is that's not excessive

7   force placed insurance because the replacement cost could be

8   120 at that point?

9          MR. BARILOVITS:  It could be.  And we would have to

10  look at the individualized characteristics of the home.

11         THE COURT:  Why would the company do that?

12         MR. BARILOVITS:  Well, as a matter of -- in the lender

13  placed insurance policy -- context, especially on the flood

14  side, it's required by federal law to maintain continuous

15  flood coverage for all the insure -- all the borrowers in

16  their portfolio.

17         So, to do that, they have to act in some ways quickly

18  and estimate the replacement cost.  If they didn't use

19  replacement costs, the system would grind to a halt and there

20  would have to be an appraisal for every property.  In fact,

21  there would be a lot of under -- uninsured homes.

22         I wonder what the plaintiffs would say -- in footnote

23  12 in our brief, I pointed to two cases in particular, in

24  fact, one involving Ms. Hall's insurer, CastlePoint, where it

25  turned out that the -- the case called Dauria, D-A-U-R-I-A,

1    in New York, where the homeowner's policy said that it was a

2    two-family dwelling, and there was some dispute over the

3    insurance, and it turned out it was a three-family dwelling.

4    In that instance, most likely, the replacement cost for the

5    home was, in fact, above last known coverage amount.  If

6    there had been a lender placed policy placed on the last

7    known coverage amount, it would have been based on simply an

8    underestimation of what that cost was.

9         I also pointed to the Bryce versus Unitrin Preferred

10   case out of Texas, where the homeowner was underinsured by

11   over $1.7 million.  I think that case actually would --

12   involved an insured suing his insurance company for that

13   wrong estimate.  In that case if, say -- I don't know what

14   the figures were in that case, but let's say they -- SunTrust

15   or the lender force placed a policy based on this

16   approximation method, which is last known coverage amount,

17   and it was $1.7 million below actual replacement cost, it was

18   no violation of law.  In fact, it was way below a violation

19   of law.

20        Again, we get back -- this -- Comcast requires a

21   methodology that shows that liability can be shown on a

22   class-wide basis.  This doesn't even come close to that.

23        THE COURT:  Just as an aside, I'd invite you to look

24   at all the opinions that I've issued in the last six years to

25   see how many footnotes are in my opinions, and then I'll give

1    you a big hint as to how much I love footnotes.

2           Anything further?

3           I'm actually going to take this issue, I think it

4    deserves some further thought, and issue a written response

5    from the Court, without footnotes.  So, I'm going to take

6    this under submission.  It's a really interesting argument, I

7    think, and one that, obviously, I think, may end up being

8    decided by other district courts, and hopefully by the Ninth

9    Circuit.  I'll take it under submission.

10          Is there anything further you want to add on the

11   record with respect to this argument that isn't already in

12   your briefs?  And if it's hidden in a footnote, I'll let you

13   argue it on the record.

14          MR. BERGER:  Your Honor, I would just encourage the

15   Court to look closely at our Exhibit 42.

16          THE COURT:  Okay.

17          MR. BERGER:  And to the Buescher declaration in

18   support of the reply, along with the excerpts of the

19   testimony of Ms. Javetta Woodward, and of Ms. Terry Curbeira,

20   who was one of SunTrust's 30(b)(6) -- was the 30(b)(6)

21   designee on what happened with Ms. Gooden.

22          THE COURT:  Right.

23          MR. BERGER:  And she talks about last known coverage.

24          Other than that, Your Honor, we'll submit.

25          One other point, Your Honor, sorry.

1          THE COURT:  Go ahead.

2          MR. BERGER:  Mr. Barilovits deposed Ms. Gooden's State

3     Farm Insurance representative, and she confirmed, this amount

4     was adequate, I used the standard procedures in the industry

5     in California for coming up with the coverage amount.

6          THE COURT:  Okay.

7          MR. BARILOVITS:  I'm not sure, was that submitted?

8          MR. BUESCHER:  That -- Ms. Linda Kelly is the

9     deponent.  Her deposition has not been submitted.  I have a

10    copy I'm happy to leave with the Court.

11         THE COURT:  Can't consider it.  Sorry, folks.

12         MR. BERGER:  Thank you, Your Honor.

13         MR. BARILOVITS:  I would ask the Court, would Your

14    Honor have any desire to see any further briefing on the

15    replacement cost issue?

16         THE COURT:  No.  I think the briefing is adequate.

17    It's been fleshed out.  I really appreciate the argument.

18    Thank you.

19         You can apologize to my court reporter after.

20         MR. BARILOVITS:  I'll apologize now.

21         THE COURT:  She's incredibly patient and has done an

22    incredible job.

23         You can see I really appreciate good lawyers and good

24    briefs, and the fact that all of you have responded to the

25    questions directly.  It's an interesting argument.  And I

1    know lawyers sometimes complain that they don't get enough

2    time to argue in court, which is why I usually set cases,

3    especially that have interesting issues to me.  So, I do

4    appreciate it.

5           We'll get something out to you as soon as possible,

6    being one of the most impacted courts in the country, but

7    we'll get something to you hopefully quickly.

8           I'll reaffirm my other decisions with respect to the

9    other classes in the order as well.

10                  (Court adjourned, 3:22 p.m.)

11                         --o0o--

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                         REPORTER'S CERTIFICATE

2

3                              ---oOo---

4    STATE OF CALIFORNIA      )
     COUNTY OF SACRAMENTO      )
5

6        I, KIMBERLY M. BENNETT, certify that I was the Official

7    Court Reporter, and that I reported verbatim in shorthand

8    writing the foregoing proceedings; that I thereafter caused

9    my shorthand writing to be reduced to typewriting, and the

10   foregoing pages constitute a complete, true, and correct

11   record of said proceedings:

12          COURT:   U.S. District Court
                     Eastern District of California
13
            JUDGE:   Honorable JOHN A. MENDEZ, Judge
14
            CASE:    SHEILA GOODEN, an individual, and
15                   MICHELLE HALL, an individual vs.
                     SUNTRUST MORTGAGE, INC., a Virginia
16                   Corporation

17          DATE:    NOVEMBER 15, 2013

18       IN WITNESS WHEREOF, I have subscribed this certificate at
     Sacramento, California.
19
                              /s/ Kimberly M. Bennett
20                            KIMBERLY M. BENNETT
                              CSR No. 8953, RPR, CRR, RMR
21

22

23

24

25
```